UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TINA HENDRICKSON,

          Plaintiff,

    v.

MARK NICHOLS,

          Defendant.

CASE NO. C17-5418 BHS

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Mark Nichols's ("Nichols") motion for summary judgment. Dkt. 32. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby denies the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On June 1, 2017, Plaintiff Tina Hendrickson ("Hendrickson") filed a complaint against Nichols, asserting that he is liable under 42 U.S.C. § 1983 for subjecting her to sexual harassment at work, thereby violating her rights under the Equal Protection Clause of the Fourteenth Amendment. Dkt. 1. On June 30, 2017, Nichols answered. Dkt. 7. On July 10, 2017, Hendrickson filed an amended complaint with additional factual detail.

Dkt. 8. On July 31, 2017, Nichols answered, asserting a variety of defenses including failure to state a claim, failure to mitigate, and various equitable defenses. Dkt. 9.

On September 12, 2018, Nichols filed a motion for summary judgment. Dkt. 32. On September 21, 2018, Hendrickson responded. Dkt. 34. On October 5, 2018, Nichols replied. Dkt. 36

## II. FACTUAL BACKGROUND

Hendrickson's claims are based on Nichols's conduct in the workplace from approximately April 2015 through April 2017. Dkt. 8 at 3–4.[1] During the relevant period, Hendrickson worked as the Office Manager of the Clallam County Prosecutor's Office ("Prosecutor's Office"), where Nichols, the elected Prosecuting Attorney, was her direct supervisor. Dkt. 34 at 1.

### a. Prior Friendship

Hendrickson and Nichols became friends in 2003 or 2004 through mutual friends of Hendrickson and her husband. Dkt. 35-2 at 2. At that time, Hendrickson worked at the Prosecutor's Office in administration, and Nichols was an attorney in the office. Dkt. 33, Ex. A at 6–9. Nichols became very close to the Hendrickson family, Dkt. 33, Ex. A at 25, officiating the wedding of Hendrickson's daughter, becoming close friends with Hendrickson's son, and later becoming godfather to her daughter's children, Dkt. 33, Ex. B at 34. Nichols spent holidays with the Hendrickson family and ate dinner at their house somewhat regularly. Dkt. 35-2 at 3.

---

[1] ECF pagination used throughout.

Hendrickson left her position in the Prosecutor's Office in 2012 to pursue other opportunities. Dkt. 33, Ex. A at 8. She worked for Clallam County Public Hospital District No. 1 for a little over a year before rejoining the Prosecutor's Office in November 2014 at Nichols's invitation, following his election as Prosecuting Attorney. Dkt. 35-3 at 7–8, 13; Dkt. 33, Ex. B at 31.

### b. Harassment

In April 2015, Hendrickson found out her husband was having an affair. Dkt. 35-2 at 5. Later that month, Nichols and Hendrickson were having a conversation in an office at work. *Id*. Hendrickson asked Nichols if he had known about the affair previously. *Id*. Nichols had in fact learned of the affair in mid-to-late 2014. Dkt. 33, Ex. B at 37–38. Nichols told Hendrickson he would not lie to her again. Dkt. 35-2 at 5. Nichols then stated that he was deeply in love with Hendrickson. *Id.* at 4.[2] While Hendrickson and Nichols had sometimes told each other they loved each other in a platonic sense over the course of their friendship, *id.* 4–5, Hendrickson knew this statement was not platonic because Nichols told her that he was *in* love with her, in contrast to past "Love you" or "I love you" statements, *id.* at 5. Nichols agrees with this characterization, saying that in the past, they had said "[l]ove you, or, I love you . . . in the way that families do." Dkt. 33, Ex. B at 44.

---

[2] Nichols describes this timeline differently, saying that Hendrickson discovered her husband's affair in March 2015, and Nichols confessed his prior knowledge of the affair and made his declaration of love in June 2015. Dkt. 32 at 3–4.

Hendrickson was very upset because she did not think Nichols's revelation was an appropriate response to her distress over her husband's affair. Dkt. 35-2 at 6. She told Nichols she was angry, hurt, and not romantically interested in him, and left the office. *Id.* Nichols disputes this response, and disputes Hendrickson's description of their subsequent interactions. Dkt. 32. Nichols declares that when he expressed romantic interest in Hendrickson, she said she had "actually thought about it," but ended the conversation based on her loyalty to her husband. Dkt. 32 at 4 (citing Dkt. 33, Ex. B at 35). Nichols says he and Hendrickson subsequently became closer friends, getting coffee together and exchanging small gifts and cards, until Hendrickson discovered his prior knowledge of her husband's affair. *Id.*, Ex. B at 41–43, Ex. A at 18–21. At that point, Nichols said their relationship "deteriorated significantly" and remained tense until Hendrickson made her complaint to Human Resources in April of 2017. Dkt. 32 at 4–5.

Hendrickson explains in her sworn interrogatory that following his declaration of love, Nichols began spending from three to six hours per day in Hendrickson's office, regularly telling her he was deeply in love with her, that he fantasized about her sexually, and that "because he and his family were wealthy, she should divorce her husband, and that he could take care of her and her children." Dkt. 35-3 at 13–14. When Nichols was not in Hendrickson's office, he "would leave her numerous phone messages, and get angry with [her] if those messages were not returned." *Id.* Nichols repeated that he was in love with Hendrickson or wanted to have a relationship with her more than ten times after the initial incident. Dkt. 35-2 at 7. She would respond that she was not interested. *Id.* at 8. Hendrickson describes a period of on-and-off harassment in which she would "think

things would get better, then it would go back again." *Id.* at 9. She stated that "as many times as we - - as I had said no, I am not interested, stop it, and it hasn't stopped yet." *Id.* Because the frequency and intensity of Nichols's overtures would vary, Hendrickson believed on numerous occasions that her rejections had been effective, only to have the overtures renewed. Dkt. 35-3 at 13.

During this period, Nichols would require that Hendrickson hug him before he left her office, or before she left his office. Dkt. 35-2 at 12–13. She "felt trapped that I couldn't leave unless he was able to touch me in some way," Dkt. 35-2 at 13, hugging her and making contact with her buttocks, Dkt. 8 at 3. Nichols would shut the door and the blinds while in her office. Dkt. 35-2 at 14. Hendrickson stated that she repeatedly told Nichols to stop it, and that she was not interested. *Id.* at 13. She explained that this behavior made her feel disgusted, because "He was supposed to be my friend and my boss and I wasn't interested in that way. He was my son's best friend. They fished, they hung out. Mark always knew how I felt . . . . That I wasn't ever interested in him like that." *Id.* at 22–33. Hendrickson explained that Nichols would often cry which made her feel sorry for him, but did not change the fact that she did not have feelings for him. *Id.* at 13. On one occasion, he tried to kiss her, and she told him to knock it off and leave her alone. *Id.* at 12. They had hugged each other on occasion previously, in the context of Nichols's close friendship with the Hendricksons and their children, Dkt. 33, Ex. A at 15, but Hendrickson described the hugs after Nichols made his declaration as longer and tighter, Dkt. 35-2 at 62, and "icky," Dkt. 35-4 at 10–11. She later told Richard Sill ("Sill"), Human Resources Manager for Clallam County, as Sill reported in his

deposition, that during this period, Nichols touched her buttocks a couple of dozen times on a pretense of removing loose strings. Dkt. 35-4 at 12–13. Sill reported Hendrickson told him she would tell Nichols she could fix it, and try to move away. *Id.* She also told Sill that Nichols told her "people who complain about harassment are not hired in this county" and on more than one occasion, Nichols reminded her that her job was by appointment. Dkt. 35, Ex. D at 71–73.

In the fall of 2015, Hendrickson and Nichols traveled to a work training in Eastern Washington which required an overnight stay. Dkt. 35-2 at 9. Hendrickson later told Sill that Nichols "wouldn't let [her] go to training unless he came with me." Dkt. 35, Ex. D at 67. Hendrickson and her husband were separated at the time. Dkt. 35-2 at 9. While travelling, Nichols described a romantic future to Hendrickson, saying that if she did not take her husband back, he would buy her a suit, and they would travel the world. *Id.* Hendrickson reiterated that she was not interested in him, and that they were just friends. *Id.* at 10. Hendrickson felt sufficiently uncomfortable that she called her estranged husband, and asked him to travel to Eastern Washington to stay with her for the remainder of the training. *Id.*

Additionally, Nichols attended a family trip with Mr. and Mrs. Hendrickson, their son Nick, and his wife, at both Nichols and Nick's insistence, after Hendrickson had asked Nichols not to come several times. *Id.* at 12. Hendrickson stated this made her feel very uncomfortable, as though Nichols was following her. *Id.* Hendrickson explained that she continued to allow Nichols to be included in her family gift exchanges and possibly continued to give him cards as part of her effort to keep her family intact following her

husband's affair. Dkt. 33, Ex. A at 21 ("Mark was a part of the family, and so in order to keep up - - in order to keep everybody happy and together, that's what I thought I had to do.").

In January 2017, Hendrickson began to believe Nichols was subjecting her work to increased scrutiny. Dkt. 8 at 3. Other employees in her position received pay raises, but Nichols denied Hendrickson a raise. Dkt. 35-3 at 13–14. Hendrickson believed these actions were intended to punish her for failure to become romantically involved with Nichols, and to pressure her to become involved with him in the future. *Id.* On April 5, 2017, Hendrickson submitted a complaint to Sill, the Human Resources Manager for the County. *Id.* A few days later, on Hendrickson's birthday, Nichols was at her home for her birthday dinner, but she spent most of the night in her room. Dkt. 33, Ex. A at 23.

**c.  Investigation**

On April 5, 2017, Hendrickson called Sill to formally complain that Nichols had sexually harassed her. Dkt. 35-4 at 2. She stated Nichols had told her over and over that it would be bad for her career if she said anything about his harassment; that Nichols would set her up for failure; that Nichols would come into her office and wouldn't leave; that he would send her flowers; and that he became agitated when she didn't respond the way he wanted. *Id.* at 2, 4. She stated that the previous Sunday Nichols had called her six times in one hour, and texted her following the last call saying "okay, I can take a hint." *Id.* at 7. She also showed Sill repeated text messages from Nichols over the period of an hour which Nichols had sent a different day. *Id.* at 16–18.

Clallam County retained an investigator, Robin Nielsen ("Nielsen"), to investigate Hendrickson's claims against Nichols. Dkt. 33, Ex. D. Hendrickson went on administrative leave during the investigation. Dkt. 33, Ex. F at 96. Nielsen produced a report concluding Nichols's behavior did not violate Clallam County's policy on sexual harassment. Dkt. 33, Ex. D at 62–63, 79–81. Hendrickson disputes Nielsen's interpretation of a number of her statements as included in the report. For example, the report stated that "Ms. Hendrickson expressed a strong desire to continue working with Mr. Nichols." Dkt. 35-2 at 25. Hendrickson says she told Nielsen that she wanted to continue in her position, not that she wanted to continue working with Nichols. *Id.* at 16–17. The report also stated that Hendrickson told Nielsen that Nichols made no direct romantic overtures toward her after the summer of 2015. *Id.* at 18–19. Hendrickson says that she told Nielsen that Nichols continued to direct romantic overtures toward her until the time of the investigation. *Id.* at 19. The report also stated that Hendrickson did not explicitly reject Nichols's initial overture, but Hendrickson stated the report is incorrect, and she was very clear with Nichols that she was not interested. *Id.* at 22.

Based on conversations with Sill, Hendrickson believed it was possible to create a better working environment going forward. *Id.* at 17. While Hendrickson reviewed and redlined the report, she did not confront Nielsen or Sill because she believed, based on her experience working for the county, that because Nielsen was hired by the county, she was "going to do what the county wanted her to do." *Id.* at 19–20. Hendrickson explained in her deposition that in the first meeting with Nielsen, Nielsen asked her how much money she wanted, and Hendrickson responded that she wanted her job. *Id.* at 24.

Following the conclusion of Nielsen's investigation in May 2017, Hendrickson sought to return to work without having to interact with or have contact with Nichols. Dkt. 8 at 4; Dkt. 33, Ex. F. Hendrickson and Clallam County were unable to come to an agreement to accommodate those conditions, Dkt. 33, Ex. F, and Hendrickson's employment was terminated effective June 19, 2017, Dkt. 35-3 at 14.

### III.  DISCUSSION

In this case, Nichols moves for summary judgment on Hendrickson's sole claim. Dkt. 32 at 1–2. The Court concludes Hendrickson has met her burden to "identify with reasonably particularity the evidence that precludes summary judgment" on each element of her claim. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

**A.   Summary Judgment**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if

there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    Equal Protection**

"To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). In order to survive summary judgment on her sexual harassment claim under § 1983, Hendrickson must submit

sufficient evidence to create a genuine dispute of material fact on two elements: (1) that she was subject to sexual harassment, and (2), that the harassment was intentional.[3]

a. **Harassment**

The Ninth Circuit explains that "[w]hile the Supreme Court hasn't specifically considered whether sexual harassment of a governmental employee can violate the Equal Protection Clause, several of our sister circuits have concluded that it can, and we agree." *Alaska v. EEOC*, 564 F.3d 1062, 1068 (9th Cir. 2009) (citing *Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir. 1997) ("[S]exual harassment in public employment violate[s] the Equal Protection Clause of the Fourteenth Amendment.") (collecting cases); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir. 1990) (sustaining section 1983 liability for sexual harassment); *Bohen v. City of East Chicago,* 799 F.2d 1180, 1185 (7th Cir. 1986) ("[S]exual harassment by a state employer . . . constitutes sex discrimination in violation of the equal protection clause.")).

The standard for sexual harassment under the Equal Protection Clause tracks Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") doctrine. As the Ninth Circuit stated, "Title VII case law establishes that sexual harassment is prohibited sex discrimination . . . it reflects our collective understanding of what conduct violates a person's rights . . . . [A]nd, not surprisingly, case law on equal protection tracks case law on Title VII." *Bator v. State of Hawaii*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1994)

---

[3] The parties do not dispute whether Nichols, the elected county prosecutor, constitutes a state actor for purposes of this case, or personally participated in the conduct at issue. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (claims under § 1983 require defendant's personal participation).

(internal citations omitted). Therefore, to avoid summary judgment on the issue of sexual harassment, Hendrickson must provide evidence on the elements of a Title VII harassment claim: that (1) she was subjected to verbal and physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) this conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Zetwick v. County of Yolo*, 850 F.3d 436, 442 (9th Cir. 2017) (citing *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1206 (9th Cir. 2016)). Relevant to Hendrickson's claim, the Ninth Circuit recently found that a reasonable juror could conclude the conduct of a supervisor who subjected an employee to repeated, unwelcome hugs was sufficiently severe or pervasive as to alter conditions of employment and create an objectively abusive working environment. *Zetwick*, 850 F.3d at 438–39, 442 (citing *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007)) (overturning district court grant of summary judgment for defendant). Also relevant to this case, the court in *Zetwick* reasoned that because the Supreme Court has recognized "a supervisor's power and authority invests his or her harassing conduct with a particularly threatening character,"[4] a supervisory position "was significant to whether or not a reasonable juror could find the hugs and the kiss to which [the plaintiff] was subjected created an abusive environment." 850 F.3d at 445.

First, Nichols admits expressing romantic feelings to Hendrickson, saying he told her he "had feelings of being in love with her." Dkt 32 at 4 (citing Dkt. 33, Ex. B at 44).

---

[4] Citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).

Hendrickson alleges that he told her he was deeply in love with her, told her he fantasized about her sexually, regularly spent from three to six hours in her office while expressing these feelings, "would not let [her] leave his office until [she] had given him a hug," Dkt. 34 at 3 (citing Dkt. 35, Ex. C at 13), and on one occasion, tried to kiss her in the office, Dkt. 34 at 3 (citing Dkt. 35-3 at 12–13). Hendrickson described Nichols's hugs as "very close" and "icky." Dkt. 34 at 4 (citing Dkt. 35-4 at 10). A reasonable juror could conclude describing sexual and romantic interest, tight, compelled hugs, and an attempted kiss amount to verbal and physical conduct of a sexual nature.

Second, while Nichols admits that "all claims of sexual harassment presuppose some form of 'unwelcomeness'" he argues that issue is irrelevant in this case because the "'intent requirement' of an equal protection claim does not require an analysis into whether the conduct was unwelcome or welcome." Dkt. 36 at 6 (citing *Trautvetter v. Quick*, 916 F.2d 1140, 1152 (7th Cir. 1990)). The Ninth Circuit, however, has held that Title VII case law "reflects our collective understanding of what conduct violates a person's rights," *Bator* 39 F.3d at 1028 n.7, and includes the welcome/unwelcome distinction as an element of sexual harassment, *Zetwick*, 850 F.3d at 442. Therefore, the Court will analyze this issue. Likely due to his view that the issue is irrelevant, Nichols fails to articulate whether he understood Hendrickson to welcome his advances. Dkts. 32, 36. On this issue, Hendrickson declares as follows

> I consistently told Mark Nichols that I was not interested in pursuing a romantic or sexual relationship with him, and I made clear to Mark Nichols that his romantic and sexual overtures were unwelcome. In spite of it having been made

> clear that his romantic and sexual overtures were unwelcome,
> Mark Nichols continued to make such overtures to me.

Dkt. 34 at 3 (citing Dkt. 35-3 at 14). She says that when he required her to hug him, she told him "Stop it. I am not interested." Dkt. 34 at 3 (citing Dkt. 35-2 at 12–13). She says that when he tried to kiss her, she recalls telling him something like "Knock it off, leave me alone." Dkt. 34 at 3 (citing Dkt. 35-2 at 12). Based on Hendrickson's repeated requests for the conduct to stop, a reasonable juror could conclude Nichols's conduct was unwelcome.

Third, Nichols argues he and Hendrickson "were close friends over several years and other than Mr. Nichols' declaration of romantic interest in Ms. Hendrickson, their interactions did not change significantly from when they enjoyed a consensual, personal relationship." Dkt. 36 at 7. Hendrickson alleges that Nichols's romantic and sexual overtures continued over a period of approximately two years, "ranging from compelled hugging to statements that he fantasized about her sexually, and wanted her to leave her husband and travel with him around the world." Dkt. 34 at 10. She alleges that after she had "made clear on repeated occasions" that she was not interested in a romantic or sexual relationship with Nichols, he subjected her work to increased scrutiny and criticism, and denied her a raise that others in her position received. Dkt. 8 at 3–4. She alleges these actions were intended to pressure her "to become romantically or sexually involved with him, and to punish her for her rejection of his romantic and sexual overtures." *Id.* at 4. In *Zetwick*, the plaintiff described "numerous unwelcome hugs [from her supervisor] and at least one unwelcome kiss that, taken as a whole, created a sexually

hostile environment." 850 F.3d at 439. There, the Ninth Circuit found sufficient disputed questions of fact to preclude summary judgement on harassment. Here, Hendrickson describes unwelcome hugs, statements of sexual and romantic interest, and possible adverse work consequences. Following the precedent established in *Zetwick*, the Court finds a reasonable juror could conclude the conduct Hendrickson describes was sufficiently severe or pervasive to alter the conditions of Hendrickson's employment and create an abusive working environment. Therefore, Hendrickson has submitted sufficient evidence to create a genuine issue of material fact as to whether the conduct she faced satisfies each element of a sexual harassment claim.

**b.    Intent**

Hendrickson must also provide evidence to support the element of intentional discrimination. "A long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory *intent* or *motive*." *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (citations omitted). Title VII and equal protection claims differ in that "a plaintiff must show intentional discrimination and state action for equal protection claims." *Bator*, 39 F.3d at 1028 n.7.

What exactly constitutes intentional discrimination in the context of sexual harassment is not clear. The Ninth Circuit says "[t]he intent requirement *is* substantive, but if case law establishes that sexual harassment is prohibited, then surely 'intentional' sexual harassment is also prohibited." *Id.* Nichols argues the Seventh Circuit was correct when it found intent must be "intent to discriminate *because of* [the plaintiff's] status as a female and not because of the characteristics of her gender which are personal to her."

*Trautvetter*, 916 F.2d at 1151. *Trautvetter* involved sexual contact between an employee and an employer to which the employee did not contemporaneously object. 916 F.2d at 1142–46. There, the court concluded the line between intentional and unintentional discrimination "becomes indistinct when those facts which are personal to an individual include attributes of sexual attraction." *Id.* at 1151. The *Trautvetter* court also drew a line between sexual interest where there is mutual attraction, and sexual interest which is unwelcome, noting that "if, as a purely personal matter, a supervisor and a particular employee do find each other sexually attractive, it would not be discriminatory under the equal protection clause for the two to engage in sexual activity." *Id.* at 1152. A recent district court order interpreting *Trautvetter* concluded that the distinction between intentional and unintentional discrimination "turn[s] on whether the plaintiff gave defendant reason to think the conduct was welcome or unwelcome." *Hespe v. City of Chicago*, 307 F. Supp. 3d 874, 887 (N.D. Ill. 2018). The Court notes that this welcome/unwelcome distinction follows the Supreme Court's conclusion in *Meritor Sav. Bank, FSB v. Vison* that conduct becomes harassment when "the respondent by her conduct indicate[s] that the alleged sexual advances [are] unwelcome." 477 U.S. 57, 68 (1986). Although Nichols places significant emphasis on the "personal characteristics" analysis, he fails to provide any similar Ninth Circuit authority applying this analysis.[5]

---

[5] Nichols directs the Court to two cases in the Ninth Circuit citing *Trautvetter* with approval, *Ramos v. Swatzell*, No. CV-12-01089-BRO-SPX, 2015 WL 13157319 (C.D. Cal. Feb. 12, 2015) and *Keenan v. Allan*, 889 F. Supp. 1320 (E.D. Wash. 1995). Both of these authorities are distinguishable. While in *Ramos* the court found nothing in the record indicated the perpetrator's intent to harass based on sex, the court was considering a motion filed by defendants other than the perpetrator. 2015 WL 13157319 at *11–12. In *Keenan*, the plaintiff

Upon review of the relevant authorities, the Court concludes that no clear test exists on the element of intent or motive. In the absence of clear precedent, the Court finds persuasive the welcome versus unwelcome test set forth in *Hespe*, 307 F. Supp. 3d at 887, even if it is somewhat redundant to the second element of a Title VII claim. The distinction seems to lie in Title VII's focus on the effect of the behavior on the plaintiff's work environment, in contrast with the equal protection clause's additional focus on the defendant's intent. The welcome versus unwelcome test highlights this distinction. *See King v. Board of Regents of Univ. of Wis. System*, 898 F.2d 533, 537–38 (7th Cir. 1990). If something more than unwelcome conduct is required to show intent or motive, the Court is satisfied that Hendrickson has submitted sufficient facts for a jury to infer intentional harassment. For example, in *King*, the court held that the plaintiff had submitted sufficient evidence for the jury to infer a supervisor's intent to harass. *Id.* at 539–40. The court reasoned and concluded as follows:

> Yet a final argument that [the supervisor defendant] Sonstein might advance is that because his actions were motivated by [plaintiff's] sex, he did not intend to harass her. It is clear, however, that the advances were unwelcome and that Sonstein knew they were unwelcome. This is not the case of a single, innocent, sexual query. Instead, we have repeated, unwelcome advances, fondling and a physical attack. The jury was justified in inferring intent to harass from these facts, and we affirm the verdict of sexual harassment against Sonstein.

*Id*.

---

failed to even allege an intent to harass based on sex. 889 F. Supp. at 1363 ("[Plaintiff] also cannot prove an intent to harass based on her sex; she never even alleges such an intent.").

Applying these principles to the facts taken in the light most favorable to Hendrickson, she has met her burden on the element of intent or motive. Nichols wanted to convert his platonic relationship with Hendrickson into a romantic, sexual relationship. Nichols says that he and Hendrickson were close friends, he told her he was in love with her, and they then became closer friends. Dkt. 32. Hendrickson says they were close friends, he told her he was in love with her, she told him she was not interested, and he began spending extended periods of time in her office, describing sexual and romantic thoughts, requiring her to hug him, and encouraging her to leave her husband. Dkt. 34 at 3. Hendrickson also says that after she made clear to Nichols repeatedly that his advances were unwelcome, Nichols denied her a pay raise granted to the other office managers in the Prosecutor's Office. Dkt. 35-3 at 13–14. Hendrickson declares her belief that denying this pay raise "was part of the effort by Mark Nichols to pressure [her] to become romantically or sexually involved with him." *Id.* The nature of his intentional persistence in romantic and sexual overtures and the clarity of her rejections would have put Nichols on notice that his repeated advances were unwelcome. These facts, if found as true, are sufficiently similar to the facts presented in *King*. Thus, the Court concludes that Hendrickson has demonstrated a genuine dispute of material fact on both elements of her claim, sexual harassment and intent.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Nichols's motion for summary judgment, Dkt. 32, is **DENIED**.

Dated this 25th day of October, 2018.

BENJAMIN H. SETTLE
United States District Judge